**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.	Case No. 3:09-cr-179-J-34JRK

EARL JAMAL BAKER

_____/

# **REPORT AND RECOMMENDATION**[1]

This cause is before the Court on Defendant's Motion to Suppress Physical Evidence (Doc. No. 26; "Motion"), filed July 23, 2009. The Motion is opposed. See United States' Response in Opposition to Motion to Suppress (Doc. No. 27; "Response"), filed July 29, 2009.

In the Motion, Defendant seeks to suppress "a 9mm Taurus handgun" seized on May 16, 2009 by officers of the Jacksonville Sheriff's Office ("JSO"), from an area in a nightclub parking lot near where Defendant was standing when ultimately arrested. Motion at 1. Defendant contends the gun was seized after he was "illegally detained by law enforcement agents[.]" Id. The Government responds that Defendant was not illegally detained because "[b]ased on the totality of the circumstances . . . no seizure occurred" and, as such, Defendant does not enjoy Fourth Amendment protections. Response at 4, 7. Alternatively, the Government contends a valid Terry stop was conducted because the arresting officer "had a reasonable, articulable suspicion that the Defendant had committed or was about to

---

[1] Within ten (10) days after service of this document, specific, written objections may be filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02(a), Local Rules, United States District Court, Middle District of Florida. Failure to file a timely objection waives a party's right to review. Fed. R. Crim. P. 59.

commit a crime[.]" Id. at 7. The undersigned concludes that Defendant's argument is without merit and recommends that the Motion be denied.

## I. Background

On June 25, 2009, a federal grand jury returned a one-count indictment charging Defendant with knowingly possessing in and affecting commerce a firearm, after having been convicted of crimes punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Indictment (Doc. No. 1) at 1-3.[2] On July 1, 2009, Defendant was arrested and made his initial appearance before the Court. See Doc. No. 6 (Minute Entry). Defendant was arraigned on July 2, 2009 and entered a plea of not guilty. See Doc. No. 10 (Minute Entry). Thereafter, on July 23, 2009, the instant Motion was filed. On July 29, 2009, the Government filed its Response. The undersigned held an evidentiary hearing on July 29, 2009. See Doc. No. 30 (Minute Entry); Doc. No. 37 ("Tr."). The argument portion of the hearing was continued to July 30, 2009. See Doc. No. 38 ("Argument Tr.").

## II. Testimony / Exhibits

The Government called one witness at the hearing: Lieutenant Larry Donel Kitchen ("Lt. Kitchen") of the JSO. The parties also stipulated that Defendant is a high school

---

[2] Although the Indictment actually reads "In Violation of Title 18, United States Code, Sections 922(g)(1) and 924(e)" (Doc. No. 1), the reference to Section 924(e) in the Indictment was characterized by the Government as a scrivener's error. On July 2, 2009, the Government moved to correct the scrivener's error (Doc. No. 12), and on the same date, an order was entered correcting the error (Doc. No. 17).

graduate. Tr. at 86. Defendant called no witnesses but entered Defendant's arrest and booking report into evidence. Argument Tr. at 6.[3]

**A.    Lt. Kitchen**

The following is a summary of Lt. Kitchen's testimony. Lt. Kitchen has been employed by the JSO for more than twenty-four years. Tr. at 7. Since June 22, 2009, he has been a "police lieutenant assigned to the northside Zone 5." Tr. at 7. Prior to holding this position, for about three years, Lt. Kitchen was a supervisor in the JSO's burglary unit. Tr. at 7. Before that, he served "as a street supervisor in the Springfield area." Tr. at 7.

The JSO allows its officers to have other jobs when the officers are off-duty. Tr. at 8. As such, Lt. Kitchen has worked some "off-duty jobs" while employed by the JSO, including working at local nightclubs for about eighteen years. Tr. at 76. While working off-duty, Lt. Kitchen retains arrest powers and police authority. Tr. at 80. At the time of the incident at issue, Lt. Kitchen had been working at a local nightclub called Bourbon Street Station ("Bourbon Street" or "nightclub") for a couple of weeks. Tr. at 8, 59. Bourbon Street is located in the 1700 block of St. Johns Bluff Road.[4] Tr. at 8.

From Lt. Kitchen's off-duty work at Bourbon Street, he is familiar with the layout of Bourbon Street, as well as the parking lot and its lighting. Tr. at 8-9. According to Lt.

---

[3]    The July 30, 2009 hearing was intended to be dedicated solely to argument. However, during the hearing, Defendant moved to reopen the evidentiary aspect of the hearing for the limited purpose of offering his arrest and booking report into evidence (Doc. No. 32). Defendant's motion to reopen the evidentiary aspect of the hearing was granted (Doc. No. 35), and the arrest and booking report was received as Defendant's Exhibit No. 1.

[4]    Lt. Kitchen testified that Bourbon Street is located on St. Johns Bluff Boulevard. Tr. at 8. However, the arrest and booking report indicates "Saint Johns Bluff Road S," Defendant's Exhibit No. 1, which is the correct address.

-3-

Kitchen, the interior of Bourbon Street is divided into two areas. Tr. at 11-12. Country music is played to the right of the nightclub, and "Urban, hip-hop, rap" is played to the left of the nightclub. Tr. at 12. The exterior has a lighted parking lot.[5] Tr. at 12.

Weapons are not permitted in Bourbon Street. Tr. at 16. In fact, there are two signs displayed on the premises as patrons enter: both signs state that weapons are not allowed.[6] Tr. at 16-17. Based upon Lt. Kitchen's experience as a police officer, Lt. Kitchen is aware that crimes of violence have been committed at Bourbon Street. Tr. at 17, 38-39, 63. According to Lt. Kitchen, the nightclub hires off-duty police officers to "[c]urtail the violence." Tr. at 18. Particularly, violence was "occurring repeatedly on Friday nights[.]" Tr. at 18. Because of this violence, Lt. Kitchen and other officers were hired to work off-duty. Tr. at 18. As of the date of the hearing, Lt. Kitchen had been working at Bourbon Street every Friday for "probably three to four months," for a total of between twelve and sixteen times. Tr. at 18.

When working at Bourbon Street, Lt. Kitchen typically is stationed in the parking lot near the building toward the south end.[7] Tr. at 19. In addition to Lt. Kitchen, there are

---

[5] Government's Exhibit No. 2 is a photograph of the front of Bourbon Street taken from the center of the parking lot. A "stanchion" style light appears to the right of the photograph. Government's Exhibit No. 3 is a photograph of the front of Bourbon Street taken from the left side of the parking lot. Two "stanchion" style lights appear in this photograph: one near the center of the photograph (which is to the left of the nightclub), and one near the far right of the photograph (which is to the right of the nightclub). In addition, a square box-style light is perched on top of the overhang of the nightclub to the left of the photograph. Government's Exhibit No. 4 is a photograph taken from a different angle which does not depict Bourbon Street but does depict a light in the parking lot.

[6] Government's Exhibit No. 6 is a photograph of the two signs posted near the entrance of Bourbon Street.

[7] When viewing Government's Exhibit No. 3, Lt. Kitchen's typical point of station is to the left of the photograph, in front of the single door.

-4-

approximately ten officers working off-duty each Friday night.[8] Tr. at 20. The officers are assigned to different areas of the nightclub. Tr. at 20. Lt. Kitchen and one other officer are assigned to the exterior of the south end of the building. Tr. at 20.

Lt. Kitchen's duty when stationed at the exterior of the building is to "support . . . club security personnel." Tr. at 21; see also Tr. at 41. In particular, Lt. Kitchen handles any issues that may arise when individuals are searched upon their arrival to the nightclub. Tr. at 21. If contraband is found on an individual, Lt. Kitchen is alerted by security personnel. Tr. at 21, 41. The security guards personally talk to Lt. Kitchen in these instances. Tr. at 42. The issues raised by the security guards are then addressed by Lt. Kitchen outside the nightclub. Tr. at 21. If there are any problems inside the nightclub, security guards walk outside and contact Lt. Kitchen or another officer. Tr. at 42.

On Friday, May 15, 2009, the night at issue, Lt. Kitchen was stationed at his normal location in the parking lot near the building. Tr. at 19-20. His vehicle, an unmarked patrol car, was parked in front of a single door on the south end of the building in a designated police parking area.[9] Tr. at 20, 46. Lt. Kitchen was wearing a full JSO uniform with a reflective traffic vest over his uniform. Tr. at 21. The other off-duty officers were also in uniform, but they were not wearing reflective vests. Tr. at 79. Lt. Kitchen was armed with a "[f]ull utility belt, holster, [and] firearm." Tr. at 21. He was carrying a Taser on the left of his belt, a Glock firearm on the right side, pepper spray, and handcuffs. Tr. at 21-22. Lt. Kitchen does not recall the weather conditions on this night. Tr. at 39.

---

[8] Lt. Kitchen could not say with certainty how many officers were working off-duty on the night of the incident at issue, but he knew generally ten officers are hired per night. Tr. at 37.

[9] Lt. Kitchen marked his location as "A" on Government's Exhibit No. 1.

About 2:00 a.m. on May 16, 2009,[10] Defendant caught Lt. Kitchen's attention. Tr. at 22. Lt. Kitchen was "on foot" when he noticed Defendant. Tr. at 46. Defendant was running at "a good pace" out of Bourbon Street with security personnel following behind him. Tr. at 22, 66. Defendant was the only patron leaving the nightclub at this time. Tr. at 45. A security guard alerted Lt. Kitchen and Lt. Kitchen's partner to "watch him," referring to Defendant. Tr. at 22, 43. Based on the instruction to "watch him," and based on Lt. Kitchen's previous experience working at nightclubs, Lt. Kitchen assumed that something had happened inside the nightclub involving Defendant. Tr. at 43, 76-77. Lt. Kitchen then watched as Defendant "ran from the club to a car that was parked in the parking lot."[11] Tr. at 22. Lt. Kitchen testified the car was "a 2000 Lincoln Towncar, silver in color." Tr. at 23.

Once Defendant reached the car, Lt. Kitchen repositioned himself by moving "to a vantage point to actually watch him as he went into the car."[12] Tr. at 22. At this point, Lt. Kitchen was "no more than 15 feet away" from Defendant, standing near a light pole in the parking lot.[13] Tr. at 23; see also Tr. at 51, 53-54. The parking lot was lit sufficiently for Lt. Kitchen to observe Defendant, although there were a number of automobiles in the vicinity. Tr. at 25, 51, 53. Lt. Kitchen watched Defendant enter the car from the driver's side. Tr. at 24. The driver's side of the car was positioned away from Lt. Kitchen. Tr. at 53. Defendant

---

[10] Lt. Kitchen was actually asked about "January 16th, 2009," Tr. at 22, but the undersigned surmises counsel's reference to January was inadvertent, as all filings indicate the incident occurred early in the morning on May 16, 2009, and Lt. Kitchen was asked about the evening starting May 15, 2009 and ending May 16, 2009 several other times during direct and cross examination.

[11] Lt. Kitchen marked the placement of the car as "B" on Government's Exhibit No. 1.

[12] Lt. Kitchen marked this position as "C" on Government's Exhibit No. 1.

[13] Lt. Kitchen was standing close to the light pole shown near the center of Government's Exhibit No. 3.

sat down in the driver's seat and closed the door. Tr. at 24-25, 57. Once the door was closed, Lt. Kitchen "saw him lean forward as if to retrieve something from under the seat." Tr. at 25. Lt. Kitchen did not actually see Defendant reach under the seat. Tr. at 57. Lt. Kitchen does not recall how long Defendant was in the car. Tr. at 56-57. Once Defendant apparently retrieved something from the car, "he exited the car, stood up, placed it in his waistband, looked around, closed the car door and stepped away from it." Tr. at 25. During this time, Defendant was facing the driver's side of the car. Tr. at 58. The car blocked Lt. Kitchen's view such that he could not observe anything below Defendant's waist. Tr. at 59. Defendant was looking around as he placed the item in his waistband, with his attention seemingly focused on another uniformed off-duty officer. Tr. at 26.

Although Lt. Kitchen could not tell what Defendant was placing in his waistband, it appeared that Defendant was attempting to conceal the item. Tr. at 25. Lt. Kitchen believed Defendant was carrying a firearm "and that his intentions there were - - not good." Tr. at 25-27; see also Tr. at 81-82. This belief was based on Lt. Kitchen's "experience, . . . training, and . . .observation." Tr. at 26.

After Defendant left the car, he began to walk "east through the parking lot," eventually walking away from the nightclub toward St. Johns Bluff Road. Tr. at 27-28, 66. Initially, it appeared to Lt. Kitchen that Defendant intended to walk toward the club. Tr. at 69, 78. During this time, the parking lot was full of cars. Tr. at 56. As Defendant walked, he was "[l]ooking around." Tr. at 28. Lt. Kitchen alerted Officer David Makauskas ("Officer Makauskas") to keep watching Defendant. Tr. at 28. Officer Makauskas was in uniform and was on foot. Tr. at 38, 46. As Officer Makauskas changed positions, Defendant

"counter[ed]" each of the officer's moves. Tr. at 28. For instance, if the officer moved toward Defendant, Defendant moved away from the officer. Tr. at 28.

During this time, the nightclub closed and "a large group of people started walking through the parking lot." Tr. at 28. Lt. Kitchen merged with the crowd, which was moving in the general direction of Defendant's location. Tr. at 28. Eventually, Lt. Kitchen and the crowd almost caught up with Defendant. Tr. at 28-29.

Once Lt. Kitchen came upon Defendant, Lt. Kitchen separated himself from the crowd and approached Defendant. Tr. at 29. As Lt. Kitchen approached, he did not attempt to physically touch Defendant. Tr. at 30, 77. Lt. Kitchen's weapon was holstered, his hand was not on the weapon, and his Taser and pepper spray remained in his utility belt. Tr. at 29. Lt. Kitchen asked Defendant, "Hey, man, what is going on?" Tr. at 71, 77. At this point, Defendant was near the St. Johns Bluff Road entrance to the parking lot.[14] Tr. at 52. Upon being asked the question, Defendant "grabbed his shirt" with one hand, and "grabbed his waistband area" with the other hand. Tr. at 29. When Defendant grabbed his waistband area, Lt. Kitchen took his weapon out of its holster. Tr. at 29. Lt. Kitchen did not immediately point his weapon at Defendant; rather, he had it pointed toward the ground in "the low ready position." Tr. at 30. Lt. Kitchen "ordered [Defendant] several times to show [Lt. Kitchen] his hands." Tr. at 30-31. Defendant refused to show Lt. Kitchen his hands. Tr. at 31. At this point, Lt. Kitchen was approximately seven to ten feet from Defendant, with nothing between the two of them. Tr. at 31, 35.

---

[14] Lt. Kitchen marked the area where this incident occurred as "D" on Government's Exhibit No. 1.

-8-

Eventually, Lt. Kitchen raised his weapon and pointed it at Defendant. Tr. at 31. He did so because of Defendant's refusal to show his hands, because Defendant "kept his right hand on his waistband area under his shirt," and because Lt. Kitchen was "intimidated by his actions." Tr. at 31. As Lt. Kitchen pointed his weapon at Defendant, he told Defendant, "Let me see your hands." Tr. at 31. Defendant "started backing up and shaking his head, as if to say no." Tr. at 31. Eventually, Defendant "pulled a silver-colored handgun from his waistband area and threw it to the ground and then he threw his hands up." Tr. at 32. Lt. Kitchen saw the handgun when it was in Defendant's hand. Tr. at 34, 35. By this time, the two had reached a car in the parking lot. Tr. at 33. Both Lt. Kitchen and Defendant were standing at the front of the car, near the hood. Tr. at 33. Lt. Kitchen was on one side of the hood and Defendant was on the other. Tr. at 33. Because the hood of the car blocked Lt. Kitchen's view, Lt. Kitchen did not see the firearm hit the ground but did hear it hit the ground. Tr. at 33, 35. Once Defendant threw the firearm to the ground, Lt. Kitchen holstered his weapon and armed himself with the Taser. Tr. at 32-33.

Another officer, Officer McCollum, handcuffed Defendant. Tr. at 34. Lt. Kitchen looked for the handgun and found it "right there where [Defendant] was standing, maybe two to three feet away." Tr. at 34. No one else was near the area at the time. Tr. at 34. When Defendant was arrested, he was in possession of the keys to the car he had previously entered. Tr. at 54. Lt. Kitchen does not recall what Defendant was wearing that night. Tr. at 39-40.

Lt. Kitchen testified that his intent upon approaching Defendant was to "make him leave the - - leave the property." Tr. at 30; see also Tr. at 70, 74, 79. Lt. Kitchen did not

-9-

actually ask Defendant to leave because as soon as Lt. Kitchen made contact, Defendant grabbed for his waistband area. Tr. at 71, 85. Lt. Kitchen testified that at that point in time, he believed Defendant was armed, but had not committed a crime; however, Lt. Kitchen did believe that if he allowed Defendant to go back into the nightclub, Defendant would commit a crime, possibly carrying a concealed weapon. Tr. at 72-73, 75, 78, 82-83.

### B.  Arrest and Booking Report

The relevant portion of the arrest and booking report, authored by Officer McCollum, states the following under the section for additional information:

> On 5/16/09 at 0220, Sgt. L.D. Kitchen[15] was gainfully employed in an off duty status at club Bourbon Street Station, 1770 Saint Johns Bluff Road S.
>
> Prior to the club closing, Sgt. Kitchen observed suspect Baker running as he exited the club and ran to and accessed the driver's side of a parked auto. Once inside the auto the suspect was observed bending forward as if to retrieve an unknown object from beneath the driver's seat. Suspect afterwards exited the auto, concealed the object in his waistband and began walking through a sea of club patrons as they exited the club. Sgt. Kitchen observed the suspect from a concealed location as the suspect kept a watchful eye on police as they patrolled the parking lot. When Sgt. Kitchen confronted the suspect to order him to leave the parking lot, the suspect immediately grabbed his waistband area with his right hand and began backing away from him. He ordered him to raise both hands at which time the suspect removed a silver colored handgun from his waist and threw it to the ground. I handcuffed this suspect and Sgt. Kitchen picked the handgun off the ground. . . .

Defendant's Exhibit No. 1 at 2.

### III.  Summary of Argument

Defendant seeks to suppress the 9mm Taurus handgun that was found in the area of the parking lot where Defendant was standing during the encounter with Lt. Kitchen

---

[15]  At the time of the incident, Lt. Kitchen was a Sergeant with the JSO.

around 2:00 a.m. on May 16, 2009.  Motion at 1.  Defendant contends he and Lt. Kitchen had "more than a consensual encounter from the outset, really, under any definition of the law."  Argument Tr. at 15.  Alternatively, assuming that a Terry stop was conducted, Defendant argues that Lt. Kitchen did not have a reasonable, articulable suspicion that criminal activity was afoot.  Argument Tr. at 6-15.

The Government asserts that the encounter was not a stop or seizure and does not fall within the ambit of the Fourth Amendment.  Response at 4; Argument Tr. at 19-23.  Alternatively, the Government contends Lt. Kitchen had a reasonable, articulable suspicion that criminal activity was imminent, amounting to a valid Terry stop under the Fourth Amendment.  Response at 7-8; Argument Tr. at 23-26.

## **IV. Analysis**

"There are three broad categories of police-citizen encounters for purposes of [a] Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests."  United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006) (citing United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989)).  As this case presents the question of whether the first or second type of encounter occurred, these two types of encounters are discussed in turn, followed by the undersigned's findings.

The protections afforded by the Fourth Amendment against unreasonable searches and seizures do not apply to the first category of encounters: exchanges which do not involve coercion or detention.  Perez, 443 F.3d at 777 (citing United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986)).  Specifically, the United States Supreme

Court has characterized these types of encounters as "[l]aw enforcement officers . . . approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002) (internal citations omitted); see also Florida v. Bostick, 501 U.S. 429, 434 (1991) (stating "mere police questioning does not constitute a seizure" and "[s]o long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required") (internal quotation omitted). When determining whether an encounter is of a consensual nature not triggering Fourth Amendment protections, several factors are relevant: "'whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education, and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.'" Perez, 443 F.3d at 778 (quoting United States v. De La Rosa, 922 F.2d 675, 678 (11th Cir. 1991)).

By contrast, the second category of encounters, brief seizures or investigatory detentions, necessarily involves Fourth Amendment protections. The Supreme Court has held that a law enforcement officer may stop an individual and briefly detain the individual for investigatory purposes if the officer has a reasonable, articulable suspicion that criminal activity may be afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968); see also United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (stating that "[u]nder Terry, law enforcement officers may detain a person briefly for an investigative stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage

in, criminal activity"). "'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]" Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)); see also United States v. Arvizu, 534 U.S. 266, 274 (2002). To meet the requisite objective reasonable suspicion, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." Wardlow, 528 U.S. at 123-24 (quoting Terry, 392 U.S. at 27).

"Reasonable suspicion is determined from the totality of circumstances and collective knowledge of the officers," which is necessarily "based on commonsense judgments and inferences about human behavior." United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (internal citation and quotation omitted). When assessing the factors identified by an officer, a court must view them in totality and cannot engage in a "'divide-and-conquer analysis[.]'" United States v. Bautista-Silva, 567 F.3d 1266, 1273-74 (11th Cir. 2009) (quoting Arvizu, 534 U.S. at 273-78). Accordingly, "reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation.'" Bautista-Silva, 567 F.3d at 1273-74 (quoting Arvizu, 534 U.S. at 273-78).

Terry also requires courts to determine "whether [a stop] was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004) (internal quotations omitted). In determining whether a stop was reasonably related, several factors are relevant: "the law enforcement purposes served by the detention, the diligence with which the police pursue the

investigation, the scope and intrusiveness of the detention, and the duration of the detention." Id. (internal quotations omitted).

Viewing in totality all factors identified by Lt. Kitchen, the undersigned concludes prior to Lt. Kitchen confronting Defendant and asking him, "Hey, man, what is going on?" Lt. Kitchen had a reasonable, articulable suspicion that criminal activity was about to occur. First, Lt. Kitchen was aware that Bourbon Street had been experiencing violence "repeatedly on Friday nights[.]" Tr. at 18. Second, Lt. Kitchen observed Defendant running from the nightclub shortly before it closed. Tr. at 22, 45, 66. At that time, no other patrons were leaving the nightclub and security personnel were following closely behind Defendant. Tr. at 22, 66. Third, a security guard told Lt. Kitchen to "watch him."[16] Tr. at 22, 43. Based upon this instruction, as well as Lt. Kitchen's previous experience having worked at nightclubs, Lt. Kitchen assumed something had happened inside Bourbon Street involving Defendant. Tr. at 43, 76-77. Fourth, Lt. Kitchen observed Defendant enter a car in the parking lot from the driver's side and "lean forward," possibly "retriev[ing] something from under the seat." Tr. at 25. Fifth, Lt. Kitchen watched as Defendant exited the vehicle and placed something in his waistband while looking around. Tr. at 25-26. Although Lt. Kitchen did not actually see what Defendant placed in his waistband, Lt. Kitchen believed Defendant was carrying a firearm "and that his intentions there were - - not good." Tr. at 25-27; see also Tr. at 81-82. Sixth, Lt. Kitchen thought Defendant was attempting to make his way back into the nightclub but decided instead to walk away from the club due to the presence of

---

[16] Defendant suggests that because it was not reported in the arrest and booking report that the security guard told Lt. Kitchen to "watch him," Lt. Kitchen's testimony in this regard should be rejected as incredible. Argument Tr. at 8. The undersigned declines to make that finding.

-14-

another uniformed officer. Tr. at 28, 38. During this time, Defendant appeared to be conducting counter-surveillance on the other officer.[17] Tr. at 28, 38, 46. It is evident under Terry and its progeny that Lt. Kitchen was justified in conducting a brief investigatory stop.[18]

After being asked by Lt. Kitchen, "Hey, man, what is going on?" Defendant grabbed his waistband area. Tr. at 29. Defendant's actions caused Lt. Kitchen to remove his handgun and point it to the ground, ordering Defendant several times to show Lt. Kitchen his hands. Tr. at 30-31. It is evident that Defendant was detained at this moment because a reasonable person would not feel free to leave. See De La Rosa, 922 F.2d at 678 (stating that "[t]he police can be said to have seized an individual if, in view of all the surrounding circumstances, a reasonable person would believe that he was not free to leave") (internal citations omitted). Only when Defendant refused to show his hands and Lt. Kitchen felt intimidated did Lt. Kitchen point his firearm at Defendant. Tr. at 31. Soon thereafter, Defendant backed up and shook his head, before finally taking a silver handgun from his waistband area and throwing it to the ground. Tr. at 31-32.

---

[17] Defendant contends that his ultimate point of arrest near the entrance to the parking lot, rather than near the entrance to the nightclub, is "the best evidence of noncriminal, innocent or noncriminal behavior . . . [which] is just inconsistent with the officer's belief and testimony and a reasonable set of inferences." Argument Tr. at 14. Defendant's ultimate point of arrest is immaterial. All of Defendant's actions and movements from the time Defendant exited the nightclub to the time Lt. Kitchen stopped him are the relevant factors in determining whether reasonable, articulable suspicion existed, not where Defendant was standing when he was ultimately stopped.

[18] That Lt. Kitchen's intent at the point of their encounter was to make Defendant leave the property, Tr. at 30, 70, 74, 79, is of no legal significance in the Terry analysis. Regardless of Lt. Kitchen's intent, the factors he articulated warranted a Terry stop. See Hicks v. Moore, 422 F.3d 1246, 1252 (11th Cir. 2005) (stating "whether reasonable suspicion existed at the time [of a Terry stop] is a question of law to be determined ultimately by judges, not policemen .... the question ... is not whether a specific arresting officer ... actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search") (citing Evans v. Stephens, 407 F.3d 1272, 1280 n.9 (11th Cir. 2005) (en banc)).

Regarding whether the stop was reasonably related to the circumstances which prompted it in the first place, Lt. Kitchen was justified under Terry in briefly drawing his weapon while detaining Defendant because in addition to all the factors previously identified by Lt. Kitchen, Defendant grabbed his waistband area when told to show Lt. Kitchen his hands. See Acosta, 363 F.3d at 1147 (when "officers were justified in suspecting that [the defendant] may have had a weapon to protect himself . . . [i]t was reasonable for one or more officers to draw a gun momentarily as [the defendant] exited his car . . . ").

The undersigned declines to conclude that the encounter between Lt. Kitchen and Defendant was consensual. See Perez, 443 F.3d at 778. When viewed in a vacuum, the question, "Hey, man, what is going on?" from Lt. Kitchen to Defendant could lead one to believe that Lt. Kitchen was attempting to have a consensual encounter and ask questions in a manner permitted by United States v. Drayton, 536 U.S. 200 (2002), and its progeny. However, Lt. Kitchen's intent upon approaching Defendant was to make him leave the property, which necessarily would have required either an escort or a brief detention if Defendant had been uncooperative. Additionally, unlike the three cases cited by the Government that appear factually similar at first glance with respect to an officer making a casual inquiry of an individual (See Response at 5-6), immediately upon the question being asked, Defendant reached for his waistband, causing Lt. Kitchen to unholster his weapon. See Perez, 443 F.3d at 778 (affirming district court's finding that an encounter was consensual when an officer briefly flashed his patrol car lights, approached a group of men at a marina, asked if they had identification, and did not unholster his firearm); United States v. Chrispin, 181 Fed. App'x 935, 937-38 (11th Cir. 2006) (unpublished) (affirming district

court's finding that an encounter was consensual when one officer was present, the officer did not unholster his firearm at any time, and the officer's questioning lasted a short amount of time); United States v. Morgan, 2009 WL 2008419, at *2 (11th Cir. July 13, 2009) (unpublished) (affirming the district court's finding that an encounter was consensual when an officer "did nothing more than approach [the defendant] in a parking lot, request permission to speak with him, and ask him about the bulge in his waistband" which was later found to have been formed with a concealed weapon). As previously stated, once Lt. Kitchen unholstered his weapon, a reasonable person would not have felt free to leave. Because Lt. Kitchen's question to Defendant was so intertwined with his weapon being unholstered, being pointed to the ground, and ultimately being pointed at Defendant, the encounter was not consensual.

## V. Conclusion

A valid Terry stop was conducted in this matter. Because Defendant threw the handgun at issue to the ground during the stop, it is not subject to suppression.

After due consideration, it is

**RECOMMENDED**:

That Defendant's Motion to Suppress Physical Evidence (Doc. No. 26) be **DENIED.**

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on November 21, 2009.

kaw
Copies to:

*James R. Klindt*
JAMES R. KLINDT
United States Magistrate Judge

Honorable Marcia Morales Howard
United States District Judge

Assistant U. S. Attorney (Guard)
Thomas M. Bell, Esquire